[This decision has been published in *Ohio Official Reports* at 94 Ohio St.3d 397.]

THE STATE EX REL. GARZA, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Garza v. Indus. Comm*., 2002-Ohio-890.]

*Workers' compensation—Specific safety requirements—Pneumatic press—Industrial Commission order denying VSSR award not an abuse of discretion when supported by "some evidence"—Ohio Adm.Code 4121:1-5-11(E)—"Operating cycle," construed and applied.*

(No. 00-1813—Submitted September 18, 2001—Decided March 6, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-1168.

_____

*Per Curiam*.

{¶ 1} On February 4, 1996, appellant-claimant, Graciela Garza, was working as a finisher for appellee Lear Corporation. Claimant was assigned to Fixture Number 85, a pneumatic press that manufactured parts for automobile heating and air conditioning units.

{¶ 2} As described by an investigator:

"When the press is activated by activating dual sensors located on each side of the press, the ram comes down and severs the lightweight plastic tube into three pieces. One of the pieces is discarded and the other two (2) are used for the automotive part. The operator has to physically reach in with his (her) hand into the press to remove the parts. [On the date in question], the dual sensor start buttons were mounted below the surface of the presses's [*sic*] table in front of the operator. * * * The start buttons which activated the press are infrared and it is necessary to activate both simultaneously in order to cause the ram (platen) of the press to come down. The press is equipped with fixed barrier guards around the sides, rear, top, and a portion of the front. However there is an open space (as measured by this

investigator) in front of the presses's [*sic*] point of operation of approximately twenty-two (22) inches [by] eighteen (18) inches. This space or area exposes the presses's [*sic*] point of operation to the operator's hands/body. * * * The start sensor buttons are required to be activated simultaneously by the operator to cause the ram of the press to come down. If the operator removes his (her) finger(s) from the buttons, the platen will return to [its] original or open position near the upper portion of the press."

**{¶ 3}** Midway through claimant's shift, scrap began piling up in the press. She reached in to remove it when something—possibly her body or a loose shirt—apparently contacted the infrared light beams that activate the sensor, causing the ram to descend on her arm.

**{¶ 4}** After her workers' compensation claim was allowed, claimant applied to appellee Industrial Commission of Ohio for additional compensation, alleging that Lear had committed several violations of specific safety requirements ("VSSR"). A staff hearing officer ("SHO") denied the application:

"It is the finding of the [SHO] that the application * * * be denied for the reason that the injury occurred *after* the entire closing cycle of the press.

"Claimant's counsel narrowed the scope of the alleged violations at hearing to [Ohio Adm.Code] 4121:1-5-11. That code section identifies six (6) acceptable methods of guarding. The machine in question was pneumatically operated and utilized a two-hand control method of guarding. Therefore, the applicable specific section would be 4121:1-5-11(E)(3). That provision describes a two-hand control as 'an actuating device which requires the simultaneous use of both hands outside the danger zone DURING THE ENTIRE CLOSING CYCLE OF THE PRESS' (emphasis added). Claimant testified that the injury occurred at a point in time when she had finished making the car parts and was cleaning out flashing from the machine. (See p. 22 of transcript.) It was the employer's argument that because of this, the holding in *State ex rel. Aspinwall v. Industrial Commission* (1988), 40

[Ohio St.3d] 55 [531 N.E.2d 681] precludes finding a Violation of a Specific Safety Requirement.  The Staff Hearing Officer agrees.  That case reads in pertinent part, 'If the General Assembly intended the danger zone to be guarded at all times, there would have been no need for the limiting language "during the operating cycle." Moreover, a two-handed tripping device is specifically enumerated as an acceptable method of "operating cycle" protection.'  (*Ibid.,* at 57 [531 N.E.2d at 684].)  The court went on to cite to a previous decision in *State ex rel. Gentzler Tool & Die [Corp.] v. Indus. Comm.* (1985), 18 [Ohio St.3d] 103 at 105 [18 OBR 137, 139, 480 N.E.2d 397, 399] noting that the provision did 'not require that a power press operator's hands be guarded from ever entering the danger zone.  Rather, it is only required that an operator's hands be guarded from entering the danger zone "during the [machine's] operating cycle." '

"A reasonable reading of this case is that 'operating cycle' refers to that period where the operator activates the machine with the intent to make a part.  Such is not the case in claimant's situation.  It is uncontroverted that she had finished making all her car parts and then was cleaning out the press when the injury happened."  (Emphasis *sic*.)

{¶ 5} In denying rehearing, a second SHO added:

"No mistake of fact is found in this case for the reasons explained below.

"The claimant alleged that the finding by the Hearing Officer that claimant's injury didn't occur during the *operating cycle* of the press was a factual mistake.

"The Hearing Officer explained that the claimant at the time of injury had finished making car parts and the press accidentally cycled when she was cleaning out flashing from the machine.  He further stated that because this injury occurred when the claimant was cleaning out the press * * * the press was not in an operating cycle because the operating cycle refers to a period when the operator activates the machine with the intent to make a part, which was not the case when the injury occurred.

"The claimant, however, argued that the press was in operating cycle because when the press accidentally cycled while the claimant was cleaning it, a *new* operating cycle was initiated.

"The claimant's contention that a new operating cycle was initiated when the press was actually started is rejected. *State ex rel. Aspinwall v. Industrial Commission* (1988), 40 [Ohio St.3d] 55 [531 N.E.2d 681] specifically held that 'operating cycle' is confined to operator-intended press activation.

"When the press was activated causing the claimant's injury it was not [a] deliberate[ly] intended activation as a review of the transcript clearly shows this activation was accidental in nature.

"Therefore, because the activation of the press was not operator intended the Hearing Officer's determination that injury didn't occur during the operating cycle of the press was not a factual error." (Emphasis added in part.)

{¶ 6} Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in denying an award for violation of a specific safety regulation ("VSSR"). Agreeing that the accident did not happen during the operating cycle, the court of appeals denied the writ.

{¶ 7} This cause is now before this court upon an appeal as of right.

{¶ 8} Ohio Adm.Code 4121:1-5-11(E) states:

"Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:

"* * *

"(3) 'Two-hand control'—an actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press."

{¶ 9} The phrase "during the operating cycle" is central to our dispute. It is a term that, although undefined in the safety code, has been extensively analyzed by this court. These cases can be difficult because of the simple truth exemplified by the claim before us: the press obviously cycled when the claimant's arm was in the danger zone or claimant would not have been hurt.

{¶ 10} The claimant's position reflects this reasoning. The hidden danger in this approach, however, is that, in effect, it declares that because there was an injury there was *by necessity* a VSSR—*i.e.,* someone was injured; therefore, the safety device was inadequate. This violates two workers' compensation tenets: (1) the commission determines the presence or absence of a violation and (2) all reasonable doubts as to a specific safety requirement's applicability must be resolved in the employer's favor. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216, 1219. It also creates two practical problems, because it (1) renders the manufacturing process impossible by preventing claimant's hands from *ever* entering the danger zone and (2) conflicts with the safety code's enumeration of a "two-hand control" as an acceptable means of protection.

{¶ 11} Our definitive discussion of Ohio Adm.Code 4121:1-5-11(E) was in *State ex rel. Aspinwall v. Indus. Comm.* (1988), 40 Ohio St.3d 55, 531 N.E.2d 681. There, claimant was involved in a two-step manufacturing process. He first inserted a part into the press and covered it with a sleeve. He then activated the press. After the ram had cycled, he would reach in, replace the sleeve, reposition the part, and reactivate the press. Claimant was injured when the ram unexpectedly descended while he was repositioning the part.

{¶ 12} As here, a violation of Ohio Adm.Code 4121:1-5-11(E) was alleged. The employer contended that "operating cycle" "must be defined within the context of the machine, *i.e.*, the physical cycling of the machine, completed when the ram ascends to its resting position. [Claimant's] definition, on the other hand,

encompasses the entire part production process—insertion of the piece through its final removal. [The employer's] contention is more persuasive." *Id*., 40 Ohio St.3d at 56, 531 N.E.2d at 683.

{¶ 13} We found in the employer's favor, rejecting the assertion that "any required insertion of the hands into the danger zone falls within the 'operating cycle.' " Id., 40 Ohio St.3d at 57, 531 N.E.2d at 684. We wrote:

"We find this interpretation to be too broad. If part removal is included in the 'operating cycle,' it would follow that placement and midphase adjustment are included as well. As such, an employer would essentially be required to prevent hands from *ever* entering the danger zone. Such a result appears inconsistent with legislative intent. If the General Assembly intended the danger zone to be guarded at all times, there would have been no need for the limiting language 'during the operating cycle.' Moreover, a two-handed tripping device is specifically enumerated as an acceptable method of 'operating cycle' protection. That device, however, only provides protection during actual physical cycling of the ram. It would not have prevented the present accident." (Emphasis *sic*.) *Id*. at 57, 531 N.E.2d at 684.

{¶ 14} The same reasoning applies here. The *Aspinwall* court also went on to explain that "operating cycle" is confined to operator-intended press activation, writing:

"*Gentzler Tool* [18 Ohio St.3d at 105, 18 OBR at 139, 480 N.E.2d at 399] also supports this conclusion. In that case, the claimant was injured when a co-worker manually activated the press, bypassing the pull-back safety guard and causing the ram to descend on the claimant's hand. We found no VSSR since there was no evidence indicating that the guards had been ineffective during the operating cycle of the power press. We reasoned that because the guards had never failed when activated by the operator, this kind of activation must be that contemplated

by the definition of 'operating cycle.' " 40 Ohio St.3d at 58, 531 N.E.2d at 684-685.

{¶ 15} This, too, makes sense in our case, particularly when dealing with the two-handed trip currently at issue. This protection is designed to work only when the employee *deliberately* removes his or her hands from the danger zone in order to press the two buttons. Since the code's authors deemed this to be an acceptable method of protection during the "operating cycle," then "operating cycle" can mean only a cycle that is operator-intended.

{¶ 16} In our case, ram descent was not operator-intended. It also, per *Aspinwall*, did not occur within that portion of the manufacturing process deemed as the "operating cycle." These conclusions are supported by "some evidence," negating any claim that the commission abused its discretion in denying the VSSR award.

{¶ 17} The judgment of the court of appeals is affirmed.

*Judgment affirmed*.

MOYER, C.J., PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

RESNICK and F.E. SWEENEY, JJ., dissent and would reverse the judgment of the court of appeals.

―――――――――

*Gallon & Takacs Co., L.P.A*., and *Theodore A. Bowman*, for appellant.

*Betty D. Montgomery*, Attorney General, and *William J. McDonald*, Assistant Attorney General, for appellee Industrial Commission.

*McCaslin, Imbus & McCaslin, R. Gary Winters* and *Joseph C. Gruber*, for appellee Lear Corporation.

―――――――――