DECISION
{¶ 1} Relator, The Gerstenslager Company, filed an original action in mandamus requesting this court to issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its award to respondent, Rhonda E. Wilson, for relator's violation of a specific safety requirement ("VSSR").
 {¶ 2} The court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court issue a writ of mandamus ordering the commission to vacate the staff hearing officer's January 31, 2006 order and, in a manner consistent with the magistrate's decision, enter a new order adjudicating the VSSR application. (Attached as Appendix A.) No party filed objections to the magistrate's decision.
 {¶ 3} Finding no error on the face of the magistrate's decision, and based on our independent review, we adopt the magistrate's decision, including the findings of fact and conclusions of law contained in it, as our own. Accordingly, we grant a writ of mandamus ordering the commission to vacate the staff hearing officer's January 31, 2006 order and to enter a new order adjudicating the VSSR application.
Writ of mandamus granted.
 TYACK and BOWMAN, JJ., concur.
BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION Rendered on February 27, 2007 IN MANDAMUS {¶ 4} In this original action, relator, The Gerstenslager Company, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to *Page 4 
vacate its award to respondent Rhonda E. Wilson ("claimant") for relator's violation of a specific safety requirement ("VSSR").
Findings of Fact: {¶ 5} 1. On January 30, 2003, claimant sustained an industrial injury while employed with relator. The industrial claim is allowed for "partial amputation right index finger; laceration right index finger; adjustment disorder with mixed emotional features," and is assigned claim number 03-804070.
 {¶ 6} 2. On December 7, 2004, claimant filed a VSSR application alleging multiple violations of specific safety requirements.
 {¶ 7} 3, The VSSR application prompted an investigation by the Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit ("SVIU"). The SVIU investigator issued a report on March 8, 2005, containing multiple exhibits.
 {¶ 8} 4. Among the exhibits to the SVIU report is claimant's affidavit executed March 10, 2005, which states:
 1. I am the claimant. I was employed by the Gerstenslager Company approximately seven (7) years at the time of the incident of record.
 2. I was first employed as an assembler. I was working as an assembler when I was injured. The day I was injured was the first time I had worked with the Mustang Oil Pan Tester. I was given about twenty (20) minutes of training before I was left on my own running the machine. Fred Duncan from second shift, Muriel Petry explained to me that the oil pans would come to me[.] I was to place the oil pan on the fixture on the tester on either side. I was to make sure that there was a gasket and no dirt. Before placing the pan on the fixture I was to turn it over and do "a nine (9) point vision check". Once placed on the fixture I would hit the two (2) palm buttons. I did not have to hold the palm buttons down for the tester to continue. Four (4) clamps came down; the pressure would for the test [sic]. We were to watch the *Page 5 
monitor. The pressure was to be twenty-eight (28) PSI or better. It would say Pass or Fail. If it passed it would go to the second stage. The second stage is the stamping which shows the pan passed the test. The clamps will then release and the operator is to [do] another visual test. The pan is then packed in the basket behind you. Fred demonstrated the procedure to me while he explained the procedure and what to do if the test failed. If it failed we were to spray it with red paint and put it in the reject. He did the demonstration maybe twice. Fred watched me do this one (1) or two (2) times, as he was training Diane Jones on another machine approximately four (4) or five (5) feet.
 3. I continued to work on the Mustang Oil Pan Tester for approximately four (4) hours before I was injured. Todd McFadden, my supervisor came to me about 2:30 AM to 2:45 AM and told me that he wanted me to train Chuck Curtis and then Ramona Whitman on the Mustang Oil Pan Tester. Chuck got there shortly thereafter. I ran one oil pan on the right side fixture and explained what to do while he watched. I then explained to him that while a test was being done on one side the pan that was already tested and stamp from the other side would be packed. The pan on the right fixture had been tested and stamped, and the clamps had released. It was still sitting on the fixture. I had told Charles that each pan, once stamped, would have either a "C" or "D" and the Ford logo on it. Charles told me he did not understand. I was stand[ing] in front of the right side fixture. He was to my left. I explained that once the pan was put on the fixture, the palm buttons would be hit. The monitor was watched to see if the pan passed the test and then it would be stamped. He asked where the stamp would go. I pointed to the area where the stamp was on the pan on the right fixture. As I pointed to the stamped letter on the pan the stamp came down onto my finger causing my injury. The palm buttons had not been hit again.
 4. At the time of my injury the stamps both had finger guards. The wire of the finger guard on the right side had a piece of duck [sic] tape of the wire. The tape was over the piece of the wire behind the stamp and the tape was applied to the post behind the wire. William Miller, the Union President told me that. *Page 6 
 {¶ 9} 5. Among the exhibits to the SVIU report is the affidavit of Charles G. Curtis executed March 22, 2005, which states:
 1. I am a witness to the incident. I have been employed by Gersten[s]lager for approximately five (5) years. I am employed as a Steel Processor. The incident of record occurred while the claimant was demonstrating how to run the Mustang Oil Pan Tester.
 2. There are two (2) stations on the Mustang Oil Pan tester. The claimant demonstrated how to run the machine by putting a pan on the left station and hit the palm buttons. The machine then tested the pan. While it was testing a second pan was put on the right station and the palm buttons for that station were hit to start that test. On both stations if the pan passed the test the stamp came down and hit the corner of the pan. There was no need to hit the buttons a second time to actuate the stamp. It was automatic if the pan passed the test. She showed me that while one side was testing a pan the operator was either preparing the other pan to test or removing it after the test and stamp. You did not have to hold the palm buttons down for the machine to activate. You only had to hit them once.
 3. I was standing next to the claimant. The claimant was pointing (at the right station) out where the stamp hit the pan, placing either a D or a B on the pan. She pointed to the corner of the pan, placing her finger under the finger guard wire. The stamp came down upon her finger causing her injury. She had not hit a second time. Since the incident of record I have worked on other oil pan testers. On these machines you had to hold the palm buttons down throughout the cycle.
 {¶ 10} 6. On March 31, 2006, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
 {¶ 11} 7. On March 31, 2006, relator, through counsel, filed an "Answer" to the VSSR application and a memorandum in support. The memorandum explains the manufacturing process and the machine that led to the industrial injury: *Page 7 
 * * * The Gerstenslager plant in Wooster, Ohio is a sheet metal fabricating plant that primarily produces body parts for automobiles. On January 3, 2003, Wilson was employed by Gerstenslager as an assembler. She worked the 11:00 p.m. — 7:00 a.m. or "third" shift at the Wooster facility.
 On January 3, 2003, Wilson was assigned to work on the Mustang oil pan tester. This is a machine that tests the seal on oil pans manufactured for the Ford Mustang automobile. The seal on the pan is tested by a pneumatic process. Once the seal passes the test a stencil stamp is placed on the corner of the pan. The stencil stamp is operated by hydraulics. The machine was brought to the Wooster facility by Shiloh Industries as part of a contract. It was put into use on the afternoon shift immediately preceding Wilson's shift.
 * * *
 The testing process is a very simple, basic one-step procedure. The machine can test two pans at once. The operator places the first pan on one side and presses the two-hand start button. The operator then waits for the computer to signify that the seal has passed its inspection and then a small "d" is stencil-stamped in the corner of the pan after the computer signifies that the seal has passed inspection. No additional step is necessary by the operator to activate the stencil stamp. The operator is not required to do anything to the pan after placing it on the machine to be tested. The stamp will only activate if the computer signals the piece has passed inspection. The operator is not required to reach over, under, around or through the operating cycle where the "d" is stencil-stamped in order to place or remove the pan from the machine. If the computer indicates that the test has failed, the small stenciling stamp is not activated.
 While the first pan is being tested and stamped, the operator places the second pan on the other side of the machine, right next to the first testing station. The process is then completed for the second pan while the operator removes and replaces the pan on the first testing station.
 At the time of the accident, the machine did not require that the two-hand start buttons be continually pressed to complete the test and stamp-stencil process. The stamp stencil itself is guarded by a detect-a-finger guard which stops the operating cycle if it senses the presence of any object. The guard descends before the stamp to less than a *Page 8 
quarter of an inch above the surface of the pan and begins to ascend after the stamp completes its downward cycle. * * * Since the accident, the machine has been modified to further enhance the safety by requiring both start buttons to remain depressed during the entire testing and stenciling process.
 {¶ 12} 8. On January 31, 2006, relator submitted the affidavit of Otis Copley executed November 28, 2005, which states:
 3. On January 3, 2003, I was assigned as the third shift maintenance supervisor at the Gerstenslager plant in Wooster, Ohio. I was responsible on that shift for maintenance of the Mustang Oil Pan Tester on which Rhonda Wilson was injured.
 * * *
 7. In order to operate the oil pan tester at that time the operator would use two hands to press two start buttons. The pan seal would then be pneumatically tested and the computer would indicate pass or fail. If the pan passed the test, the detect-a-finger guard would come down several seconds ahead of the stencil stamping mechanism. The stencil stamping mechanism would then stamp a "D" or a "C" on the corner of the pan depending on which side of the testing machine the pan was placed. This machine will not stamp twice without going through an entire operating cycle.
 {¶ 13} 9. At the January 31, 2006 hearing, claimant testified on cross-examination by relator's counsel. The following exchange was recorded: Q The D side completely cycled? A Yes.
 Q And it stamped down once? A Yes. Q After pass?
 A Yes. *Page 9 
 Q And you think it stamped a second time, I'm asking? * * * You believe it came down a second time, some malfunction?
 A Yes.
 * * *
 Q When you operate this machine you use both hands; right, to activate it?
 A Yes.
 Q And the complete cycle goes through, it tests and you look in the computer and it says pass or fail and if it says pass, the stamper comes down it?
 A Right. Yes. You hit the button. It says pass or fail and the stamper comes down and the clamps release it and you pick the part up and turn and put it in the basket.
 Q You had not yet taken the D side off?
 A No. I left the D side on. I wanted him to learn what to look for when he flipped it over and to make sure they had been stamped and how to pack it. There was a certain procedure for packing.
 Q When you put your finger in there, it already stamped the pass stamp on it, that little sign, the stamp that the part passed inspection.
 A It already completed that cycle. The D side was done.
 {¶ 14} 10. Following the January 31, 2006 hearing, the SHO issued an order granting the VSSR application. The SHO's order explains:
 The injured worker was injured on 1/30/2003 while working at the Gerstenslager Company. The injured worker worked as an assembler and had been employed for approximately seven years at the time of injury.
 The injured worker was injured when she was operating the mustang oil pan tester. The injured worker indicated in her affidavit dated 3/10/2005 that she was working approximately four hours with the tester prior to the injury.
 The mustang oil pan tester job operated as follows: *Page 10 
 After the oil pan arrived at her station, the injured worker visually inspected the pan. If the pan passed her inspection, the injured worker hit two palm buttons. After the injured worker's inspection, the computer would automatically activate the stamp. The stamp would come down and imprint the pan.
 The injured worker indicated in her 3/10/2005 affidavit and testimony that she was not required to hold the palm buttons down a second time. That is, the stamp would automatically activate following the computer inspection.
 At the time of the injury the injured worker was demonstrating the job to fellow employee Chuck Curtis. The injured worker testified she had demonstrated to Mr. Curtis the inspection process. The injured worker testified the press had completed the cycle as the stamp (the letter "D") was successfully imprinted on the oil pan. The injured worker was pointing with her index finger at the "D" stamp to show Mr. Curtis the location of the stamp, when the stamp came down on the injured worker's finger.
 * * *
 The injured worker's counsel also asserts the employer violated Ohio Administrative Code Section 4123:1-5-11(E).
Said code section requires the following:
 (E) Hydraulic or pneumatic presses.
 Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:
 (1) Fixed barrier guard — an enclosure to prevent hands or fingers from entering the danger zone;
 (2) Gate guard — a movable gate operated with a tripping device to interpose a barrier between the operator and the danger zone and to remain closed until the down stroke has been completed;
 (3) Two-handed control — an actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press; *Page 11 
 (4) Pull guard — attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle;
 (5) Restraint or hold-back guard — with attachments to the hands or wrists of the operator to prevent hands or fingers entering the danger zone during the operating cycle;
 (6) Other practices, means, or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above.
 Evidence on file indicates the mustang oil pan tester was safeguarded with a detect-a-finger guard. The detect-a-finger guard stops the operating cycle if the guard senses the presence of an object. The employer's representative asserts that the detect-a-finger guard satisfies the requirements of Ohio Administrative Code Section 4123:1-5-11(E)(6).
 The Hearing Officer finds the employer has failed to comply with Ohio Administrative Code Section 4123:1-5-11(E)(6).
 The Hearing Officer finds the injured worker was the operator of the mustang oil pan tester at the time of injury.
 Operator is defined in Ohio Administrative Code Section 4123:1-5-01(B)(92) as "any employee assigned or authorized to work at the specific equipment."
 The injured worker's supervisor, Todd McFadden, assigned and authorized the injured worker to train Chuck Curtis, per the 3/10/2005 affidavit from the injured worker.
 This finding is based on the injured worker's testimony that she performed the work (inspection of the part) and had hit the palm buttons to imprint the "D" stamp. The injured worker was pointing to the "D" stamp at the time of the injury. The injured worker pointed at the stamp in response to a question by the individual she was training. The injured worker's 3/10/2005 affidavit indicates the injured worker pointed to the "D" stamp after Mr. Curtis asked the location of the stamp. *Page 12 
 The Hearing Officer finds, based on the injured worker's testimony and 3/10/2005 affidavit, the injured worker was an operator of the machine at the time of injury. Although Mr. Curtis was also standing near the machine, Mr. Curtis was in training. The injured worker was training Mr. Curtis in the use of the mustang oil pan tester. It was the injured worker who stamped and inspected the oil pan.
 Moreover, the means by which the mustang oil pan tester was guarded, the detect-a-finger guard did not comply with Ohio Administrative Code Section 4123:1-5-11(E)(6).
Said provision requires the following:
 (E) Hydraulic or pneumatic presses.
 (6) Other practices, means, or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above.
 The Hearing Officer finds the detect-a-finger guard in place at the time of injury did not prevent the injured worker's right finger from entering the danger zone during the operating cycle.
 The injured worker's finger was injured when she pointed to the "D" stamp. The injured worker's finger was in the danger zone of the stamp at the time of injury.
 The danger zone is defined in Ohio Administrative Code Section 4123:1-5-01(B)(34) as "the point of operation where a known hazard exists."
 Based on the injured worker's testimony and affidavit dated 3/10/2005 as well as the 3/22/2005 affidavit of Mr. Curtis, the Hearing Officer finds the injured worker's finger was not prevented from entering the danger zone during the operating cycle.
 The injured worker has established the detect-a-guard did not prevent her finger from entering the danger zone, as the stamp came down on the injured worker's finger while in the danger zone. *Page 13 
 Accordingly, as the injured worker has established a violation of Ohio Administrative Code Section 4123:1-5-11(E), it is therefore ordered by the Staff Hearing Officer that an additional award of compensation be granted to the injured worker, in the amount of thirty (30) percent of the maximum weekly rate under the rule of State ex rel. Engle v. Industrial Commission, 142 Ohio St. 425.
(Emphasis sic.)
 {¶ 15} 11. On March 22, 2006, relator moved for rehearing pursuant to Ohio Adm. Code 4121-3-20(C). In its memorandum in support of rehearing, relator, through counsel, claimed that the SHO's order of January 31, 2006, contained a clear mistake of law because the evidence failed to show that the injury occurred during the operating cycle of the machine.
 {¶ 16} 12. On May 4, 2006, another SHO mailed an order denying rehearing. The SHO's order explains:
 It is hereby ordered that the motion for rehearing filed 03/22/2006 be denied. The Employer has not submitted any new and relevant evidence nor shown that the order of 01/31/2006 was based on an obvious mistake of fact or on a clear mistake of law.
 It is found that the requirements of O.A.C. 4121-3-20(C)(1)(a) or (b) have not been met and the request for a VSSR rehearing must be denied.
 {¶ 17} 13. On May 25, 2006, relator, The Gerstenslager Company, filed this mandamus action.
Conclusions of Law: {¶ 18} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below. *Page 14 
 {¶ 19} Ohio Adm. Code Chapter 4123:1-5 sets forth specific safety requirements relating to "Workshop and Factory Safety," which is the caption to that chapter.
 {¶ 20} Ohio Adm. Code 4123:1-5-11 is captioned "Forging machines, other power machines and machine tools, hydraulic and pneumatic presses, and power press brakes."
 {¶ 21} Ohio Adm. Code 4123:1-5-11(E) is captioned "Hydraulic or pneumatic presses," and states:
 Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:
 (1) "Fixed barrier guard" — an enclosure to prevent hands or fingers from entering the danger zone;
 (2) "Gate guard" — a movable gate operated with a tripping device to interpose a barrier between the operator and the danger zone and to remain closed until the down stroke has been completed;
 (3) "Two-hand control" — an actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press;
 (4) Pull guard — attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle;
 (5) Restraint or hold-back guard — with attachments to the hands or wrists of the operator to prevent hands or fingers entering the danger zone during the operating cycle;
 (6) Other practices, means or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above. *Page 15 
 {¶ 22} Ohio Adm. Code 4123:1-5-01(B) provides definitions applicable to Ohio Adm. Code 4123:1-5-11(E), as follows:
 (34) "Danger zone": the point of operation where a known hazard exists.
 * * *
 (70) "Guarded": means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact.
 * * *
 (92) "Operator": any employee assigned or authorized to work at the specific equipment.
 * * *
 (97) "Point of operation": the area where material is actually positioned and work is being performed during any process.
 {¶ 23} However, Ohio Adm. Code 4123:1-5-01(B) does not provide a definition for operating cycle.
 {¶ 24} Recently, in State ex rel. Advanced Metal Precision Products v.Indus. Comm., 111 Ohio St.3d 109, 2006-Ohio-5336, the court expanded the judicial definition of the term "operating cycle" as used in Ohio Adm. Code 4123:1-5-11(E) and overruled its prior decisions in State exrel. Aspinwall v. Indus. Comm. (1988), 40 Ohio St.3d 55, and State exrel. Garza v. Indus. Comm. (2002), 94 Ohio St.3d 397, that had given a more limited interpretation to the term.
 {¶ 25} In Advanced Metal, the Supreme Court of Ohio analyzed the factors important to defining operating cycle:
 "Operating cycle" is not defined in the safety code, and the term defies easy interpretation judicially, for any workable definition balances the need for safety with the need for danger-zone accessibility. Because the danger zone is *Page 16 
hazardous, the temptation is to say that the zone should be completely inaccessible. With certain types of manufacturing processes, inaccessibility is possible. Many manufacturing and assembly processes, however, require an employee's hands to, at some point, enter the danger zone. The reasons are many: part insertion or removal, part adjustment, and positioning of sleeves or molds. * * *
 It is equally tempting to say that if a press is cycling when a press accident occurs, the press is operating and is therefore in an "operating cycle." Garza, citing Aspinwall, rejected this logic, holding:
 "The hidden danger in this approach, however, is that, in effect, it declares that because there was an injury there was by necessity a VSSR — i.e., someone was injured; therefore, the safety device was inadequate. This violates two workers' compensation tenets: (1) the commission determines the presence or absence of a violation and (2) all reasonable doubts as to a specific safety requirement's applicability must be resolved in the employer's favor. It also creates two practical problems, because it (1) renders the manufacturing process impossible by preventing claimant's hands from ever entering the danger zone and (2) conflicts with the safety code's enumeration of a `two-hand control' as an acceptable means of protection." * * * Garza, 94 Ohio St.3d at 400 * * *
(Emphasis sic.) Id. at ¶ 8-10.
 {¶ 26} In Advanced Metal, the court held: "[T]hat the term `operating cycle' in former Ohio Adm. Code 4121:1-5-11(E) encompasses all operator-activated press activity, whether intentional or accidental." Id. at ¶ 20.
 {¶ 27} The court's holding in Advanced Metal is helpful but not dispositive of this case. Undeniably, claimant, Rhonda Wilson, intentionally activated the two-hand start buttons that began the operating cycle that preceded her injury. Unlike the scenario inAdvanced Metal, there is no real issue here as to whether an unintentional cycling of the machine caused the injury. *Page 17 
 {¶ 28} The issue here is whether the injury actually occurred during the operating cycle as that term is used at Ohio Adm. Code4123:1-5-11(E).
 {¶ 29} Relator claims that the operating cycle, activated by claimant's pressing of the two-hand start buttons, had ended before the hydraulically-operated stencil stamp cycled upon claimant's finger. That is to say, relator claims that the second cycling of the stencil stamp that injured claimant occurred outside the operating cycle for this machine.
 {¶ 30} The SHO's order of January 31, 2006, finds that the "detect-a-finger guard in place at the time of injury did not prevent the injured worker's right finger from entering the danger zone during the operating cycle." This finding seems to imply that the injury occurred during the operating cycle, but there is no explanation nor any evidence cited to support what may be implied by the finding.
 {¶ 31} Moreover, the implication that the injury occurred during the operating cycle seems to be undermined by the SHO's unexplained statement that claimant testified the "press had completed the cycle as the stamp (the letter `D') was successfully imprinted on the oil pan."
 {¶ 32} Clearly, under Ohio Adm. Code 4123:1-5-11(E), claimant had the burden of proving that relator had failed to guard "during the operating cycle." While the SHO entered a finding that implies that the injury occurred during the operating cycle, the SHO failed to set forth a brief explanation supported by some evidence to support a finding that the injury occurred during the operating cycle. This failure is a violation of State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, the syllabus of which states: "In any order of the Industrial Commission granting or denying benefits to a *Page 18 
claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision."
 {¶ 33} It is not the duty of this court to define the operating cycle for the mustang oil pan tester machine at issue here. That duty remains with the commission. Thus, this matter must be remanded to the commission with instructions that the commission render aNoll-compliant determination of whether the injury occurred during the operating cycle of the machine.
 {¶ 34} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of January 31, 2006, and, in a manner consistent with this magistrate's decision, enter a new order adjudicating the VSSR application. *Page 1