[Cite as *State ex rel. Thompson Elec., L.L.C. v. Indus. Comm.*, 2017-Ohio-7611.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Thompson Electric, Inc., | : | |
| | : | |
| Relator, | : | No. 16AP-23 |
| | : | |
| v. | : | (REGULAR CALENDAR) |
| | : | |
| The Industrial Commission of Ohio, Thomas R. Otto, c/o Ms. Terry L. Otto, Spouse, and Ms. Jessica L. Otto, Child, | : | |
| | : | |
| Respondents. | : | |
| | : | |

# D E C I S I O N

### Rendered on September 14, 2017

**On brief:** *Kastner Westman & Wilkins, LLC*, and *Keith L. Pryatel,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Lisa R. Miller,* for respondent Industrial Commission of Ohio.

**On brief:** *Stewart & DeChant, LLC*, and *Scott E. Stewart*, for respondents Thomas R. Otto, Terry L. Otto, and Jessica L. Otto.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION
ON MOTION TO STRIKE

DORRIAN, J.

{¶ 1} In this original action, relator, Thompson Electric, Inc., requests this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Terry L. Otto, spouse of Thomas R. Otto ("decedent"), and child Jessica L. Otto for an additional award for relator's violation of a specific safety requirement ("VSSR").

{¶ 2} This matter arises out of an incident that occurred on May 25, 2011 which resulted in the death of decedent, an employee of relator. Relator had been contracted by American Electric Power ("AEP") to replace a transmission pole in Wooster, Ohio. On the date of the incident, decedent was working on the project as a foreman for relator. During the course of preparing for the work, a derrick boom operated by one of decedent's crew members approached a distribution line that had not been de-energized, causing electricity to arc through the derrick boom. The electricity traveled from the derrick boom into the attached digger derrick vehicle, through the outriggers, and into the ground. Decedent, who was standing in a driveway approximately eight feet away from the digger derrick vehicle, was fatally electrocuted.

{¶ 3} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. In the decision, the magistrate concluded that the June 3, 2015 order of the commission's staff hearing officer ("SHO") failed to comply with *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991). Specifically, the magistrate found that the SHO provided no explanation or supporting evidence for the finding that relator violated Ohio Adm.Code 4123:1-5-23(D)(3) by failing to "[a]ssure that the conductor is guarded from accidental contact." Accordingly, the magistrate recommended this court issue a writ of mandamus ordering the commission to vacate its order and, in a manner consistent with *Noll* and the magistrate's decision, enter a new order adjudicating the VSSR application.

{¶ 4} On May 24, 2017, Otto filed the following objection to the magistrate's decision:

> The Magistrate erred in its decision:
>
> "...that this court issue a writ of mandamus ordering the commission to vacate the SHO's order of June 3, 2015, and, in a manner consistent with the magistrate's decision, enter a new order that, in accordance with *Noll*, finds whether or not relator complied with Ohio Adm.Code 4123:1-5-23(D)(3) by its alleged reliance on AEP to cover the distribution wire at issue here."

On June 20, 2017, relator filed a brief in opposition to Otto's objection. On June 23, 2017, Otto filed a motion to strike relator's June 20, 2017 brief.

{¶ 5} "In order to establish a VSSR, a claimant must establish that: (1) an applicable and specific safety requirement existed at the time of the accident; (2) the employer violated the requirement; and (3) the violation proximately caused the injury." *State ex rel. Sunesis Constr. v. Indus. Comm.*, 10th Dist. No. 09AP-423, 2010-Ohio-4434, ¶ 5, citing *State ex rel. Lange v. Indus. Comm.*, 111 Ohio St.3d 563, 2006-Ohio-6211, ¶ 14. "Because a VSSR penalizes the employer, specific safety requirements 'must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer.' " *Id.*, citing *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172 (1989).

{¶ 6} "In any order of the Industrial Commission granting or denying benefits to a claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision." *Noll* at syllabus. "The purpose for requiring such evidentiary identification and explanation is so that 'meaningful review can be accomplished.' " *State ex rel. Buttolph v. Gen. Motors Corp.*, 79 Ohio St.3d 73, 75 (1997), quoting *Noll* at 206. A reviewing court will not "search the commission's file for 'some evidence' to support an order of the commission not otherwise specified as a basis for its decision." (Emphasis omitted.) *Noll* at 204, quoting *State ex rel. Mitchell v. Robbins & Myers, Inc.*, 6 Ohio St.3d 481, 483 (1983). "*Noll* applies to VSSR review in mandamus." *Sunesis* at ¶ 6, citing *State ex rel. Donohoe v. Indus. Comm.*, 10th Dist. No. 08AP-201, 2010-Ohio-1317, ¶ 18.

{¶ 7} Respondent contends in the filed objection that the commission's order complied with *Noll* because the commission "did not need to explain why it found certain evidence unpersuasive, it is not required that they cite evidence that they considered and rejected, they do not have to list the evidence considered as a presumption of regularity attaches to the commission's proceedings which is they considered all the evidence before them." (Otto's Obj. at 33.)

{¶ 8} The SHO's order stated:

> Clearly the evidence shows that the employer did not (1) assure that the conductor was de-energized and grounded, or (2) assure that the conductor was moved, or (3) assure that the conductor was guarded from accidental contact and an employee was designated to act as a signalman, or (4) assure that an insulated link was installed [and] an employee is designated to act as signalman, and

therefore did not comply with the applicable safety requirement on the date of injury herein.

The SHO concluded:

based upon the Bureau of Workers' Compensation's Safety Violations Investigation unit packet on file, signed affidavits and testimony at hearing from Mr. Shortridge, the Injured Worker's expert, and Mr. Anderson the owner of the company, all indicate that at the time of the injury, none of the four requirements outlined in Ohio Adm. Code 412[3]:1-5-23(D) were complied with.

(Appended Magistrate's Decision at ¶ 39.)

{¶ 9} Ohio Adm.Code 4123:1-5-23(D) provides:

Before an employee moves or operates power cranes, shovels, backhoes or any other type of material hoisting equipment within ten feet of an energized electrical conductor, the employer shall:

(1)  Assure that the conductor is deenergized and grounded, or

(2)  Assure that the conductor is moved, or

(3)  Assure that the conductor is guarded from accidental contact and an employee is designated to act as signalman to direct the operator in the movement of the equipment, or

(4)  Assure that an insulated boom or an insulated type guard about the boom or arm of the equipment and a dielectric insulator link between the load and the block are installed and an employee is designated to act as signalman to direct the operator in the movement of the equipment.

{¶ 10} Thus, the SHO's order essentially recites the regulations at issue without explaining specifically how relator violated the regulation and what specific evidence the SHO relied on in making its findings. *See Sunesis* at ¶ 7. As noted by the magistrate, the SHO's order fails to provide any reasoning or specific evidence in support of its findings that relator failed to "[a]ssure that the conductor was guarded from accidental contact and an employee [was] designated to act as signalman" pursuant to Ohio Adm.Code 4123:1-5-23(D)(3). Relator specifically contested this issue before the SHO by arguing that it was the responsibility of AEP, not relator, to assure that the line was guarded from accidental contact. We agree with the magistrate that the commission had a duty to determine this issue in the first instance. Because the commission failed to address this issue, it abused

its discretion. *State ex rel. Brown v. Hoover Universal, Inc.*, 10th Dist. No. 10AP-21, 2010-Ohio-6174, ¶ 6, citing *State ex rel. Peabody Coal Co. v. Indus. Comm.*, 66 Ohio St.3d 639 (1993), citing *State ex rel. Gen. Am. Transp. Corp. v. Indus. Comm.*, 49 Ohio St.3d 91 (1990). As a result, we agree with the magistrate that the SHO's order fails to comply with the requirements of *Noll.*

{¶ 11} Both Otto and relator invite this court to reach the merits of the matter by examining the evidence in the record to determine whether it supports the SHO's determination that relator violated Ohio Adm.Code 4123:1-5-23(D). It is not, however, the role of this court to undertake a review of the record to find whether "some evidence" exists to support the SHO's findings. *See Noll* at 204. Meaningful review cannot be accomplished where an order, such as the one here, fails to "briefly explain the reasoning and specifically state which evidence was relied upon." *Id.* at 205. Therefore, we decline at this time to determine whether sufficient evidence in the record exists to support the SHO's findings.

{¶ 12} On June 23, 2017, Otto filed a motion to strike relator's brief in opposition to Otto's objection to the magistrate's decision. Otto argued that relator in its brief improperly raised issues outside the scope of Otto's objection to the magistrate's decision. As we have declined to review the merits of this matter, Otto's arguments are moot. We therefore deny Otto's June 23, 2017 motion to strike.

{¶ 13} Based on a review of the magistrate's decision, an independent review of the record, and due consideration of Otto's objection, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. We therefore overrule Otto's objection to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. Accordingly, we grant a writ of mandamus ordering the commission to vacate the SHO's June 3, 2015 order and, pursuant to and in compliance with this decision and *Noll*, enter a new order adjudicating the VSSR application.

*Motion to strike denied;*
*objection overruled;*
*writ of mandamus granted.*

TYACK, P.J., and KLATT, J., concur.

_____

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel.                                   :
Thompson Electric, Inc.,

                                                       :

          Relator,                                     :

v.                                                     :                    No.  16AP-23

                                                       :
The Industrial Commission of Ohio                                     (REGULAR CALENDAR)
and                                                    :
Ms. Terry L. Otto
and                                                    :
Ms. Jessica L. Otto,

                                                       :

          Respondents.                                 :

                                                       :

---

### MAGISTRATE'S DECISION

#### Rendered on May 12, 2017

---

*Kastner Westman & Wilkins, LLC, Keith L. Pryatel,* and *Bruce H. Fahey,* for relator.

*Michael DeWine,* Attorney General, and *Lisa R. Miller,* for respondent Industrial Commission of Ohio.

*Stewart & DeChant, LLC,* and *Scott E. Stewart,* for respondents Ms. Terry L. Otto and Ms. Jessica L. Otto.

---

IN MANDAMUS

{¶ 14} In this original action, relator, Thompson Electric, Inc. ("Thompson Electric" or "TEI") requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting to respondents Ms. Terry L. Otto and Ms. Jessica L. Otto ("Terry and Jessica") their application for an additional award for violation of a specific safety requirement ("VSSR"), and to enter an order denying the application.

<u>Findings of Fact</u>:

{¶ 15} 1. On May 25, 2011, Thomas R. Otto ("decedent") was fatally electrocuted while employed with relator. Terry L. Otto is the surviving spouse. Jessica L. Otto is the surviving child.

{¶ 16} 2. A death claim (No. 11-326990) was certified by relator.

{¶ 17} 3. On October 1, 2012, Terry and Jessica filed an application for a VSSR award.

{¶ 18} 4. The VSSR application prompted an investigation by the Safety Violations Investigation Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 19} 5. On January 15, 2013, the SVIU investigator, Julia M. Riley, conducted an onsite investigation at the home offices of Thompson Electric located in Munroe Falls, Ohio. Relator's vice-president, Bill Anderson, was present during the onsite visit. Also present was relator's attorney.

{¶ 20} 6. On January 18, 2013, the SVIU investigator issued her report of investigation, which presents eight enumerated paragraphs under the heading "Discussion." Paragraphs two through eight state:

> [Two] On May 25, 2011 Mr. Otto (foreman), James Martin (operator), and Matt Bickel (flagger) were assigned to replace a transmission pole on Geyers Chapel Road near Smithville Western Road in Wooster, Ohio according to Mr. Anderson. The existing pole had a transmission line with sixty-nine thousand volts that had been de-energized and a distribution line with twenty-nine thousand volts that had not been de-energized. Mr. Bickel was setting up the traffic zone and Mr. Otto and Mr. Martin were unloading an auger from the truck. Mr. Otto got on the truck and attached the auger with a nylon choker hooked to the boom. Mr. Otto then got off the truck to "spot" for Mr. Martin. Mr. Martin began to remove the auger from the truck, the boom came in contact with the energized distribution line and energized the truck. The voltage went out the outriggers of the truck and into the ground. Mr. Otto was standing in a driveway approximately eight feet away from the truck. Under the driveway where Mr. Otto was standing was a culvert, the electricity entered Mr. Otto's body via his small toe on his right foot. Mr. Anderson explained when the incident occurred due to Mr. Martin's position, [Mr.] Martin could only see one line * * * and believed this line to be the de-energized transmission line when in reality there were two lines; the transmission line and the distribution line. * * *

[Three] Mr. Anderson explained the involved distribution line had not been de-energized as the residences in the area were required to have power. AEP had placed a one shot recloser on the distribution line; if anything would come in contact with the line[,] power would be shut down immediately instead of allowing an item to strike the normal three times (three shot recloser) before power was shut down. The distribution line was approximately twenty feet from the ground and the boom was raised at the maximum level approximately seventy-five to eighty degrees and eighteen to twenty feet in the air at the time of the incident. Both Mr. Otto and Mr. Martin were aware of the wires as they had been at the site the day prior to the incident dropping off poles. Mr. Otto had received the clearances from the Transmission Contract Engineer the morning of the incident; the engineer was en route to the site but was running late.

[Four] The involved truck was a 2007 International 4300 * * * equipped with a Pitman digger derrick * * * and Stahl full utility line body, pole carrying rack, and hydraulic capstan drive * * *. At the time of the incident the truck was equipped with grounding wire and a screw anchor * * *. The grounding wire is used to ground the truck either by using the screw anchor screwed into the ground or connected to the grounding wire on a utility pole * * *. When Mr. Anderson arrived at the site after the incident the grounding wire from the truck was attached to a grounding wire on a pole. The employees at the site initially stated the truck was grounded at the time of the incident. Later Lee Elgin and Eric Rutkowski stated the truck was not grounded when the incident occurred and was grounded after the incident. Mr. Anderson advised company policy is to ground the truck when the boom goes into the air and there is a possibility of coming in contact with energized circuits. Mr. Anderson further advised the grounds are grounded unless in an open parking lot with no wires. Mr. Otto had the responsibility of grounding the truck, Mr. Anderson stated. The operator does not have the responsibility to ground the truck or ensure it has been grounded. Mr. Otto was the foreman, controlled everything on the ground, had the responsibility to ground the truck, and to ensure the truck is grounded.

[Five] The involved truck was not in position to set a pole at the time of the incident; it was over twenty feet away from where the truck would be positioned when setting a pole, Mr. Anderson explained. The position of the truck confirms Mr. Otto and Mr. Martin were unloading and were not in the process of setting a pole. There was not a trench or

excavation in the area, and the incident did not involve any underground installations. When the incident occurred the equipment and truck did not tip or over turn nor fail. The truck was on a level surface and the auger did not come loose to nor strike Mr. Otto. Mr. Otto was on the ground and not on any portion of the truck when the incident occurred. After the incident the truck was towed and a complete inspection was conducted. There were no burns located on the tires and evidence indicated electrical current through the outriggers. The truck was found to be in good condition and it was re-certified. AEP tested the recloser after the incident with no issues found.

[Six] Mr. Otto was a foreman responsible for overseeing the crew, getting equipment to the job, and acting as a liaison between the company and the customer, according to Mr. Anderson. Mr. Otto worked out of the local union hall and Thompson Electric provided annual training consisting of OSHA 10 hour course, OSHA 20 hour course, and OSHA 30 hour course, rescue, CPR, First Aid, rubber product safety, and AEP training safety and orientation * * *. Mr. Otto was provided with and was required to wear at the time of the incident a hard hat, safety glasses, rubber over shoes, and leather gloves. Mr. Otto was also provided with rubber gloves with protectors and rubber sleeves; these are required any time an employee is working within proximity of live lines or within the minimum approach distance of two feet to two and one half feet. These items are stores in a leather bag and tested every sixty days. Located on the involved truck are hook sticks and a "shot" gun, line guards, insulator hoods (2-3 on each truck), and blankets (2-3 on each truck). The bucket trucks carry six line hoses. The hook sticks, "shot" gun, line guards, insulator hoods, blankets, and line hoses were not needed or required for unloading the auger from the involved truck. The blankets are stored in a clean, dry plastic tube in a compartment on the truck and the line hoses, shot gun, line guards, insulator hoods and hot sticks are stored in a clean, dry plastic sealed compartment. Investigator Riley asked if the hard hat had any voltage protection and Mr. Anderson stated he did not believe so.

[Seven] During the on-site investigation Investigator Riley interviewed witness Matthew Bickel. An affidavit was obtained from Mr. Bickel at that time * * *.

[Eight] Investigator Riley attempted to contact listed witnesses Lee Elgin, Eric Rutkowski, and James Martin January 16, 2013. Messages for all three workers were left and as of the writing of this report none had responded.

{¶ 21} 7. As earlier indicated, the SVIU investigator interviewed Matthew Bickel and obtained an affidavit which was presented as an exhibit to the SVIU report of investigation. The affidavit of Matthew Bickel executed January 15, 2013 states in 17 enumerated paragraphs:

> [One] I am a witness in the incident involving Mr. Otto.
>
> [Two] I began working at Thompson Electric Inc. the first time in approximately 2005 as a ground man. I worked at the company for approximately one year or more. I returned to the company for approximately one year approximately four years ago. This last time I began working for Thompson Electric approximately three years ago as an operator. At the time of the incident involving Mr. Otto I was an operator; this is my current position. As an operator I operate the equipment, the shovel, flag traffic, and anything they ask me to do.
>
> [Three] On May 25, 2011 * * * I was working with Mr. Otto, Jimmy Martin, Eric Rutkowski, and Lee Elgin at a site on Geyers Chapel Road near Smithville Western Road in Wayne County, Ohio. We were going to change out two poles and transfer the distribution and transmission wire. This was my first day at the site. I believe the rest of the crew had been at the site previously to spot poles (laying the new poles on the ground in the area).
>
> [Four] At the time of the incident I was flagging traffic in the middle of the work zone. The digger truck was north of me approximately forty yards. Mr. Martin was operating the digger truck. Mr. Rutkowski was in the bucket truck at the next pole down. Mr. Otto was on the ground near the digger truck. Mr. Martin and Mr. Otto had been unloading the auger from the digger truck. Mr. Martin swung the boom over the side of the truck and the boom caught the distribution line.
>
> [Five] When the boom touched the wire Mr. Otto was on the east side of the truck out of my vision. I do not know where Mr. Otto was in relation to the truck. The lowest point of the auger was approximately eight to ten feet from the ground when the incident occurred and out of Mr. Otto's reach.
>
> [Six] I believe the truck was grounded at the time of the incident. I did not see who grounded the truck prior to the incident. The ground was taken down later by Mr. Rutkowski

or Mr. Elgin. I did not see anyone ground the truck after the incident.

[Seven] As soon as I arrived at the site I started setting the control zone and started flagging. I was not involved in any meeting discussing the hazards or the electric lines. The others talked but I was busy setting the zone; there was quite a bit of traffic on the road that day.

[Eight] Normally the crew has a meeting after arriving at the job site. The hazards of the job site area [are] discussed, distribution lines and transmission lines are discussed (the heights of these and working around them).

[Nine] Every employee that works at the sites are provided with rubber gloves with protectors, rubber sleeves, rubber over shoes, safety glasses, hard hat, safety vest, and leather gloves. The gloves and sleeves come in a box and a plastic bag; it is the employee's responsibility to keep these items clean, dry, and to test daily. The company has the equipment tested by an outside source approximately every sixty days.

[Ten] The trucks are equipped with line hoses (a minimum of six for each truck), blankets (at least 4, more are available), a shot gun, and one finger stick. The hoses are normally located in the lay down bin on the driver's side of the truck; this is a clean, dry area. The blankets are kept in a plastic cylinder tube in the belly of the truck; this is a clean, dry area. The shot gun and finger stick are located in the same bin as the hoses. Insulator hoods are available in the job trailer.

[Eleven] I am not aware of any issues with the boom or the truck at the time of the incident. The auger did not come loose at the time of the incident. The auger did not strike Mr. Otto. The truck did not tip or over turn at the time of the incident. The truck was on a level surface at the time of the incident.

[Twelve] I do not know if there was a designated signal man; if there was a signal man it would have been Mr. Otto. I believe this would have been discussed at the morning meeting.

[Thirteen] Mr. Martin was aware of the overhead lines. Mr. Martin was an experienced operator and had worked around overhead lines numerous times. I was not aware of previous issues Mr. Martin had working around over head lines.

[Fourteen] The transmission lines (69,000 volt line) had been de-energized. The distribution line was not de-energized or grounded; I believe this is because the residences needed power.

[Fifteen] The company had a policy for working around overhead electrical wires at the time of this incident. Each employee is provided with a copy of this policy when they are hired. I believe the minimum clearance distance for the distribution line would have been between four and five feet.

[Sixteen] There was not any trench or excavation in the area when the incident occurred and this incident did not involve any trench or excavation.

[Seventeen] There were not poles being driven at the time of the incident. The auger was being unloaded from the truck when the incident occurred; no work had started.

{¶ 22} 8. Apparently, Terry and Jessica filed an intentional tort action in the Summit County Court of Common Pleas. The action generated several depositions. In May 2015, counsel for Terry and Jessica submitted to the bureau several deposition transcripts relevant to the pending VSSR application. The deponent's name, date of deposition, and the page length of the transcripts are identified below:

| Deponent's Name | Date of Depo | Transcript Page Length |
|---|---|---|
| Bill Anderson | 4-9-14 | 104 |
| Robert Sallaz | 6-17-14 | 93 |
| Clarence Richard (Rich) Householder | 5-5-14 | 104 |
| Rhonda Householder | 8-19-13 | 94 |
| Lester Elgin | 4-9-14 | 94 |

{¶ 23} 9. In February 2015, Terry and Jessica, hired Gary F. Shortridge as their expert to prepare a report regarding the VSSR.

{¶ 24} His seven-page report is divided by headings. The headings are "Chronology," "Observations," "Summary," and "Conclusion."

{¶ 25} Under "Chronology," Shortridge wrote:

On Wednesday, May 25, 2011 a Thompson Electric line crew was sent * * * to replace wood poles for AEP. Prior to the crew being sent to this location the wood poles had [to] be delivered to [the] site and the primary conductor on the existing primary pole had been relocated from it's [sic] original location on the wood crossarm to a temporary location on a fiberglass hot arm. * * *

The crew members present at the site was [sic]:

Tom Otto - Journeyman Lineman
Jim Martin - Journeyman Lineman
Lester Elgin - Journeyman Lineman
Eric Rutkowski - Journeyman Lineman
Matt Bickel - Operator

The crew set up the work zone on Geyers Chappel Rd. in preparation of performing the task of replacing the wood poles. At some point there was a [Job Safety Analysis] filled out and signed by the crew members. The digger derrick was set up in front of [the] driveway. The crew then moved the new wood pole to be installed to a location so that the hole could be dug and the pole could be set without moving the digger derrick. * * *

Someone from Thompson Electric received a clearance from AEP that the 69kV circuit running on top of the existing pole was de-energized and was ready to be grounded. There was no written documentation of this Lock out Tag Out event.

Lester Elgin and Eric Ruthkowski [sic] setup [sic] the bucket truck to test and ground the 69kV circuit.

Matt Bickel was flagging traffic through the work zone.

Tom Otto and Jim Martin were preparing to remove the auger from the bed of the digger so it could be attached to the digger derrick to dig the hole for the pole.

Jim Martin [was] operating the controls on the digger derrick[. He] rotated the boom to a point over the center of the truck bed and lowered the winch line to the location of the auger lying in the bed of the truck. Tom Otto placed a steel sling around the auger and hooked it to the winch line * * *. Jim Martin raised the auger out of the bed of the truck and rotated the boom toward the field side of the truck. The boom contacted the 7200 volt distribution circuit * * *. Tom Otto fell to the ground[. The] crew members started CPR and

called 911. Tom Otto was transported to Wooster Community Hospital where he was later pronounced dead.

{¶ 26} Under "Observations," Shortridge wrote:

- Primary conductor was not covered up with line hose or plastic cover. * * *

- Truck was not grounded. * * *

- Brunt [sic] marks under wooden pads. * * *

- No written documentation for the lock out tag out procedure on the 69kV circuit.

- Pole lying across driveway. * * *

- Jim Martin continued operating the boom of the digger derrick after losing sight of Tom Otto. Tom Otto was identified as the signal person.

- Coroner Report burn marks on Mr. Otto 4th & 5th toes on right foot. This would indicate that Tom Otto was stepping down off of digger derrick.

- Eric Ruthkowski [sic] (Journeyman Lineman) completed the JSA that morning on site.

- It is not apparent who the foreman actually was for this particular project.

- Jason Hosteler arrived on site after the accident and signed the accident report as foreman. Jason also directed workers to ground digger derrick post-accident.

- AEP representative arrived on site after the accident.

- The 7200 volt circuit breaker **did not** lock out.

- It is very clear that Thompson Electric insist [sic] that the foreman is responsible for safety.

- Mr. Martin lost sight of Mr. Otto who was the signal person. Mr. Martin continued operating the digger derrick after that and contacted the 7200 volt primary conductor.

- Brunt [sic] marks under the wooden pad also confirm the truck was not grounded.

- With the digger derrick not being grounded the fault current on the 7200 volt primary circuit would not have been at a high enough level to cause the oil circuit breaker to operate, when the boom contacted the un-insulated conductor.

(Emphasis sic.)

{¶ 27} Under "Summary," Shortridge wrote:

The **Root Cause** for this accident:

- Lack of:

- **Managements Commitment:** The level of commitment management demonstrates to the safety and health process; the systems that control the safety culture: safety policy and procedures and active management participation.

- **Accountability:** The process used to assign safety and health management responsibilities and to evaluate, recognize and reward performance.

- **Employee Participation:** The extent to which employees participate in and are encouraged to be involved in safety and health.
- **Safety Culture:** The organization climate, values, management style and social norms related to safety.

- **Hazard prevention and controls:** The process to identify and correct unsafe acts and unsafe conditions.

- The above Root Causes were very evident during the deposition of Bill Anderson when an upper level manager states that Safety is not [h]is Job, his Job is to win contracts.

(Emphasis sic.)

{¶ 28} Under "Conclusion," Shortridge wrote:

On May 25, 2011 Tom Otto was employed by Thompson Electric Inc. and was fatally injured at work.

It is uncertain who the actual foreman was on site the day of the accident[. Anyone] of the Journeyman Line were qualified to be the foreman. Who would have been the foreman if any of the other crew members would have been injured?

In an attempt to identify Tom Otto as foreman Thompson Electric made an error and Tom Otto was paid [a] higher rate than that required for this agreement.

There were numerous violations of several safety rules, Federal, States of Ohio, IBEW, AEP and Thompson Electric.

There was an attempt to cover up the fact that the digger derrick was not ground.

OSHA was given false information about the digger derrick grounding. If OSHA would have be[en] given accurate information the citations and fines would have been substantially higher.

There is a definite failure on the part of Thompson Electric to employ Safety Professional[s] with credentials other than being the General Foreman's spouse.

There was fictitious information sent to AEP to cover up key facts of the accident. If AEP would have been given accurate facts about the grounding of the digger derrick Thompson Electric would have be[en] at risk of losing the contract with AEP.
I believe that all the items here solidify the fact that Thompson Electric, Inc. has a total disregard for Safety.

This disregard for Safety was demonstrated when Mr. Anderson an upper level manager for Thompson Electric stated that it was the foreman's responsibility to ground the truck.

{¶ 29} 10. In May 2015, relator hired expert Howard L. Call to prepare a report regarding the VSSR. His eight-page report is divided by headings. The headings are "Facts," "Observations," "Summary," "Concluding Facts," and "VSSR Response."

{¶ 30} Under "Facts," Call wrote:

Wednesday, May 25, 2011, Thompson Electric in cooperation with America Electric Power (AEP) assigning a work order to Thompson Electric Inc. (TEI) to replace 2 transmission poles in the area of * * *.

In preparation for the project prior to Wednesday May 25 two transmission poles were delivered to the project and AEP placed the 7200 volt electric distribution conductor, #4 copper out onto hot arms to gain more vertical clearance for

pole setting purposes from its original position on the existing pole. * * *

The crew consisting of:

Tom Otto, Qualified Crew Foreman and Qualified Journeyman Lineman
Jim Martin, Qualified Journeyman Lineman
Lester Elgin - Qualified Journeyman Lineman
Eric Rutkowski - Qualified Apprentice Lineman
Matt Bickel - Operator/flagger

Part of the crew assembled at the TEI Staging site and proceeded to the work site * * * to prepare to work the AEP assigned project, setting transmission poles. Foreman Tom Otto and Journey Lineman Jim Martin drove straight to the job site from home. The crew held their tail board project review, completed the Job Safety Analysis. The job had two points of contact with AEP, first was the transmission line clearing and release to apply grounds by TEI onto the transmission line and second the hold off on the ground distribution circuit recloser which is designed to immediately open upon a circuit fault instead of attempting to reclose several times and then lockout. In addition AEP was assigned to place rubber identification and protection hose cover-up to the distribution lines. TEI was not a vendor contracted with AEP for Distribution work at this time. AEP on account of the sever[e] fog Wednesday May 25, 2011 had not left the AEP Wooster Line shop to do so prior to the TEI crew setting up.

The transmission bucket crew preceded down the road 1 span to ground the 69,000 volt line as directed by Foreman Tom Otto after the approval and clearance was received by Foreman Tom Otto from AEP Transmission Dispatch.

Tom Otto and Jim Martin set up the digger derrick truck at * * *. The outriggers and pads for truck stability were placed out for the truck outriggers and Tom Otto and Jim Martin proceeded to remove the transmission pole auger from the truck bed to change the auger out in preparation of drilling the pole hole.

Foreman Tom Otto received the approval from AEP Transmission Contractor Representative Fred Stringer that the recloser had been placed on one shot. Jim Martin raised the digger derrick boom and rotated to the position directed by Foreman Tom Otto to lift the auger with a nylon lifting sling from the truck bed. Foreman Tom Otto descended from

the truck bed via the exit stairs on the passenger truck side body and proceeded to signal with hand motions to Jim Martin to lift the auger. Jim Martin lost sight of Foreman Tom Otto and continued to lift and rotate the truck derrick boom, without direction, nearing the 7200 volt conductor creating a ground potential to earth which arced to the digger derrick truck to ground out through the outriggers and outrigger pads to earth. Jim Martin immediately reversed his rotation away from the overhead 7200 volt conductors at 0818 hours. Journeyman Lineman Jim Martin looked for Foreman Tom Otto and found Foreman Tom Otto on the ground. Journeyman Lineman Jim Martin called out to the flagger Matt Bickel that Tom Otto was down and to the crew down the road who were preparing the Transmission. A 911 call was placed and first aid CPR was started on Tom Otto until the EMS squad arrived and transported Foreman Tom Otto to Wooster Community Hospital, where Tom Otto was pronounced dead.

The Wayne County Sheriff's office arrived at 0833 hours and documented the accident scene and took information from Eric Rutkowski, Jim Martin, Lester Elgin.

{¶ 31} Under "Observations," Call wrote:

- All TEI employees are IBEW trained via ALBAT and 4th District Safety trade and all safety procedures.

- All TEI employees are trained in OSHA 10, OSHA 20[,] OSHA 30.

- All TEI employees are aware of all Policies on Safety clothing, PPE, Rigging, Lifting, Ground to ground rubber gloves and sleeves policy.

- JSA was completed prior to the work beginning by the crew and written by Eric Ruthoski [sic] and approved by Foreman Tom Otto and the balance of the crew.

- Primary conductor operating at 7200 was extended out from the center of the pole for clearance by AEP. The wire had not been covered with rubber line hose by AEP.

- Truck was not grounded at the time of the accident by evidence of the burnt asphalt under the outrigger pads.

- The recloser did not operate after the arc occurred, an arc mark on the primary #4 copper conductor was located and

that wire was removed for review. The homes in the area did not lose power.

- A reasonable conclusion is the extreme moist air relating to the foggy conditions possibly caused the air between the primary #4 conductor and the derrick truck boom to ionize and arc without actual[ly] touching the boom onto the wire, creating the arc. A copper wire of this size would melt and burn down to the ground upon direct contact with a ground.

- Fault current from the contact existed via the outriggers through the outrigger pads into the asphalt.

- Jim Martin continued to operate, violating lifting safety requirements training after losing sight of the lifting observer Foreman Tom Otto.

{¶ 32} Under "Summary," Call wrote:

Items leading to the Fatality:

IBEW Union employees not following their IBEW Union employee training, 4th District Safety Procedures Rule and TEI Policy on:

[One] Truck grounding rule, failure to properly ground equipment. 4120:1-5-23 (A)

[Two] Improper use of PPE (overshoes). 4121:1-5-17 (I)(4) 4121:1-5-23 (E)(a)

[Three] Failure of Foreman Tom Otto to maintain eyesight with Truck Operator Jim Martin. 4121:1-5-23(D)(3)(4)

[Four] Operating equipment and failure of spotter, Foreman Tom Otto to stop Journeyman Jim Martin encroaching the minimum approach distance to energized equipment. 4121:1-5-23

**Root Cause Analysis**
- Failure to follow the IBEW ALBAT training and safety rules, 4th District Safety rules and TEI Safety Policies by Foreman Tom Otto and crew.

- Failure to await the installation of the rubber hose on the distribution lines by AEP for an additional layer of protection and visible identification of the primary wire.

- Failure of Foreman Tom Otto to wear his safety overshoes.

- Failure of the operator Journeyman Jim Martin in continuing to operating [sic] the derrick without direction from Foreman Tom Otto who was out of visual sight.

- Failure by Foreman Tom Otto to utilize permanently installed protective grounding system.

- Failure of spotter, Foreman Tom Otto to stop Journeyman Jim Martin encroaching minimum approach distance to energized equipment.

These conclusions are drawn from testimony or statements of Jim Martin, Qualified Journeyman Lineman, Lester Elgin-Qualified Journeyman Lineman, Eric Rutkowski- Qualified Journeyman Lineman, Matt Bickel- Operator and the investigative report of Julia Riley of the Ohio Bureau of Workers' Compensation. These Lineman, Foreman are professionally trained in their trade including the safe operation and creation of a safe work plan for their daily work.

{¶ 33} Under "Concluding Facts," Call wrote:

Prior to May 25, 2011 AEP assigned a transmission project to TEI for replacement and removal of transmission poles on Geyers Chappel Road, Wooster, Ohio. The work was assigned to Crew Foreman Tom Otto from General Foreman Rich Householder, Foreman Tom Otto was experienced in this type of work.

The crew led by Foreman Tom Otto did their JSA safety briefing prior to the project beginning at the site and it was documented by the crew onto the provided form.

Foreman Tom Otto and Lineman Jim Martin failed to ground the digger derrick to earth or the AEP system pole grounding electrode prior via the installed grounding equipment on the digger Derrick truck prior to raising the boom.

TEI supplies Personal Protective equipment, Hard Hats, Rubber Overshoes, Rubber Gloves, Sleeves, Face shield, safety glasses and more per their obligation as well as their union agreements.

TEI trains on OSHA 10, OSHA 20, OSHA 30 and all other safety related and company policies to maintain its employee's safety credentials and TEI policies.

{¶ 34} Under "VSSR Response," Call wrote:

**OAC Ann. 4123:1-5-23 Electrical Conductors and equipment (A) (B) (C) (D) (E)**

Foreman Tom Otto chose not to wait for AEP to apply rubber hose to the wire.

Foreman Tom Otto failed to follow TEI, ALBAT and 4th District Safety procedures and training in not grounding the truck and allowing operation of a derrick in the air out of site of the spotter.

Foreman Tom Otto did not follow assured clear distance to an energized conductor.
TEI the employer supplies all safety gear as well as standards on grounding vehicles. The Digger Derrick was equipped by TEI with the grounding system. The Digger Derrick was removed from service and inspected by a third party and found in good operating condition with industry standards including the grounding system.

(Emphasis sic.)

{¶ 35} 11. On June 3, 2015, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. The transcript is 97 pages in length.

{¶ 36} During the hearing, Bill Anderson testified on behalf of Thompson Electric.

{¶ 37} During the hearing, Mr. Shortridge testified on behalf of Terry and Jessica.

{¶ 38} During the hearing, Bill Anderson was examined by relator's counsel, Mr. Fahey. The following exchange occurred:

MR. FAHEY: Bill, would you describe the scope of the work for the Hearing Officer?

MR. ANDERSON: The scope of work was to replace two poles that were existing. Poles were dropped off by AEP, Tom Otto was working with a man by the name of Rudy Stringer, he was the TCR, that's a transmission contractor representative.

MR. FAHEY: Is that from AEP?

MR. ANDERSON: That's from AEP. Tom was working with him on that, he told him to report --

[RESPONDENT'S COUNSEL]: Objection to how he knows that.

THE HEARING OFFICER: Go ahead and finish, I'm going to allow it, go ahead.

MR. ANDERSON: Tom reported to the job, Rudy was in conversation with Tom as to when the 69 line was taken out of service and when he had clearance to put grounds on.

And at the same time as to when the 7,200 volt line was put on, AEP did all of the so-called switching/tagging. AEP does that themselves, they don't allow contractors to do that at a tran station level.

At distribution level they allow the contractors to call in and do that but we weren't cleared to do any of the distribution work, we were told not to do it.

Putting the conductor out on the hot arm or extender away from the pole, that was done by AEP, they were the ones that were supposed to come and cover the lines, that was not part of our scope of the job.

THE HEARING OFFICER: Let me ask you this, you guys did know that the distribution line was still alive, didn't you?

MR. ANDERSON: We did know, yes, that's correct.

THE HEARING OFFICER: And even though you guys are in the business of installing poles, don't you guys have to take some sort of safety measures, knowing that there's a line up there that's live?

MR. ANDERSON: Well, we would not have under typical circumstances started that job until AEP got out and put all the line hose up. We wouldn't have done anything. AEP, my understanding was their people were delayed because of fog.

THE HEARING OFFICER: Do you have any idea why these guys went ahead and started?

MR. ANDERSON: I have no idea.

THE HEARING OFFICER: All right, I mean you weren't there, right?

MR. ANDERSON: I was not there.

THE HEARING OFFICER: All right, okay. All right, go on.

MR. ANDERSON: That was basically the extent. They were to drill a hole beside the pole, set the new pole, put up new insulators and remove the old pole down to the distribution.

MR. FAHEY: Did they do any work on the distribution wires?

MR. ANDERSON: No.

MR. FAHEY: Okay. Any other work besides what you just described?
MR. ANDERSON: No, they were instructed not to work on the distribution.

I think Mr. Otto stated that in somebody's deposition, that they were told not to do any of the distribution work.

MR. FAHEY: I think you misspoke, Mr. Otto?

MR. ANDERSON: Not Mr. Otto, one of the other people. I think that person made a statement that Mr. Otto told them not to do any of the distribution work. That was the crew.

MR. FAHEY: Okay. Mr. Otto was the liaison with AEP for that particular job?

MR. ANDERSON: He was the foreman on the job, he was in contact with the TCR, TCR is our only contact, with the foreman.

(June 3, 2015 Tr. at 48-52.)

{¶ 39} 12. Following the June 3, 2015 hearing, the SHO issued an order granting a VSSR award based solely on a finding that relator had violated Ohio Adm.Code 4123:1-5-23(D), which is captioned "Minimum clearance."

{¶ 40} Mailed July 22, 2015, the SHO's order of June 3, 2015 explains:

[T]he Staff Hearing Officer specifically finds that the employer was in violation of the requirements set forth in Ohio Adm. Code 4123:1-5-23(D) mandating that certain procedures be followed before an employee moves or

operates power cranes, shovels, backhoes within ten feet of an energized electrical conductor (1) assure that the conductor is de-energized and grounded or (2) assure that the conductor is moved, or (3) assure that the conductor is guarded from accidental contact and an employee is designated to act as a signalman to direct the operator in the movement of the equipment, or (4) assure that an insulated boom or an insulated type guard about the boom or arm of the equipment and a dielectric insulator link between the load and the block are installed and an employee is designated to act as a signal man to direct the operator in the movement of the equipment. All of the evidence on file, particularly the Safety Violations Investigation Unit Report, affidavits on file, as well as all testimony presented at hearing supports a finding that none of the four requirements were complied with when operating the boom near the power source when lowering the auger. There can be no question that operating a boom near a distribution line would create a situation that would expose workers to electrical conductors that are not isolated from all possible sources of voltage.

The employer's contention that Subsection 4123:1-5-23(D) was not violated is based upon the Decedent's own negligence by not grounding the truck or designating an employee as a signal man when the boom was lowering the auger. Said contentions as previously indicated are rejected. The Staff Hearing Officer finds the sole purpose of a violation of a specific safety requirement is to protect injured workers from their own negligence. The Staff Hearing Officer finds that an employee's negligence in failing to protect himself from an injury due to an employer's violation of a specific safety requirement will never bar recovery because "specific safety requirement exist to promote a safe work environment and to protect employees against their own negligence and folly". State ex rel. Colterman v. St. Mary's Foundry (1989), 48 Ohio St.3d 42; State ex rel. Pressware International, Inc. v. Indus. Comm. (1999), 85 Ohio St.3d 284; 288; State ex rel. Quality Tower Service, Inc. v. Indus. Comm. (2000), 88 Ohio St.3d 190. The Staff Hearing Officer finds that the critical issue in any violation of a specific safety requirement claim in regards to a negligence or a unilateral negligence defense is always whether the employer complied with the specific requirement, and only after it is found that the employer has met the code requirement can the Injured Worker's negligence bar a violation of a specific safety requirement.

The Staff Hearing Officer finds that the requirement under subsection (D) is clearly the duty and responsibility of the employer. Furthermore, the Staff Hearing Officer finds that the employer cannot shift its responsibility to its employees by simply instructing its employees to follow the procedures outlined in this section. To hold otherwise would give a patently unreasonable interpretation of Ohio Adm. Code 4123:1-5-23(D) that would effectively place the burden of providing a safe working environment solely upon the employee. State ex rel. Coffman v. Indus. Comm. (2005), WL736638 (Ohio Appeals 10th District).

Clearly the evidence shows that the employer did not (1) assure that the conductor was de-energized and grounded, or (2) assure that the conductor was moved, or (3) assure that the conductor was guarded from accidental contact and an employee was designated to act as a signalman, or (4) assure that an insulated link was installed [and] an employee is designated to act as signalman, and therefore did not comply with the applicable safety requirement on the date of injury herein.

Based upon the Bureau of Workers' Compensation's Safety Violations Investigation unit packet on file, signed affidavits and testimony at hearing from Mr. Shortridge, the Injured Worker's expert, and Mr. Anderson the owner of the company, all indicate that at the time of the injury, none of the four requirements outlined in Ohio Adm. Code 412[3]:1-5-23(D) were complied with. Therefore, based upon the evidence, it is found that the employer was in violation of this subsection as of the date and time of the Decedent's injury.

It is further found that the employer's violation of Ohio Adm. Code 4123:1-5-23(D) was the proximate cause of the injury. If any one of the four requirements outlined in said rule were complied with which is all the rule required, the injury most likely would not have occurred, and therefore, the employer's failure to comply with said subsection was the proximate cause of the injury.

It is therefore, ordered that an additional award of compensation be granted to the Decedent's spouse in the amount of 15% of the maximum medical rate under the rules of State ex rel. Engle v. Indus. Comm. 142 Ohio St. 425.

{¶ 41} 13. On August 20, 2015, relator moved for rehearing pursuant to Ohio Adm.Code 4121-3-20(C). In its memorandum in support, relator's counsel wrote:

The SHO ruled that the Employer violated Ohio Administrative Code 4123:1-5-23(D) and that said violation was the proximate cause of the injury. A review of the BWC Investigator's report, affidavits, and Hearing Transcript, shows that the SHO misconstrued the evidence and based his decision on clear mistakes of the facts and law as it relates to this injury.

A review of the BWC Investigator's report, affidavits, and the file transcript clearly shows that the Employer complied with OAC 4123:1-5-23(D)(3).

### FACTS

Thompson Electric Inc. was contracted by American Electric Power (AEP) to replace two transmission utility poles in the area of * * * near Wooster. The two transmission utility poles were delivered to the project on May 24, 2011 and were laid on the ground at * * *. The utility pole on which Thomas Otto and Jim Martin were to work held two sets of wires - the highest electrical wire is known as the transmission line, which carried 69,000 volts, and the lower wire is known as the distribution line, which carried 7,200 volts. Prior to TEI performing any work on the job on the date of injury, May 25, 2011, AEP's utility crews moved the 7,200 volt electric distribution line onto extender cross-bars with what are known as "hot arms" to gain more vertical clearance for pole setting purposes. This procedure extends the electrical wires out further from the center of the utility pole.

The crew assigned to do the work was led by the Injured Worker, Tom Otto, the Foreman and a qualified journeymen/lineman. Other crew members were Jim Martin, a qualified journeyman/lineman, Lester Elgin, a qualified journeyman/lineman, Eric Rutkowski, a qualified apprentice/lineman and Matt Bickel, an operator/flagger.

On the morning of the accident, Elgin, Rutkowski and Bickel, assembled at the TEI staging site and proceeded to the work site in a bucket truck and a digger derrick truck. Otto and Martin drove directly to the job site from their homes.

Upon arriving at the job site, Foreman Otto's crew held the tailboard safety review, completing the Job Safety Analysis form.

As part of Foreman Otto's duties, Foreman Otto contacted AEP transmission dispatch and received approval and clearance for the work by Elgin, Rutkowski and Bickel to

proceed with their portion of the work on another pole, which was not part of the work Otto and Martin were to do.

Foreman Otto next received the confirmation from AEP Transmission that a piece of equipment known as a "ReCloser" had been placed on what is called "one shot," pertaining to the transmission wire.
Elgin, Rutkowski and Bickel moved the bucket truck away from the injury site to perform work not relevant to the facts of the injury.

Foreman Otto and Martin['s] portion of the work was to use a digger derrick truck, which contained an auger, to dig the hole in the ground to set the new pole. This is where the injury occurred.

AEP's own crews were assigned to place rubber identification and protective hose cover on the 7,200 volt distribution line to guard the wire on the pole where Otto and Martin were to work from accidental contact prior to Otto and Martin starting their portion of the work.

Despite AEP not completing its portion of the job by placing the protective rubber hoses onto the 7200 volt distribution line to guard the wire from accidental contact, Foreman Otto and Martin nevertheless began to set up the digger derrick truck to attach the auger to the boom to prepare to drill the hole for the new pole. The outriggers and pads for truck stability were set. The auger bit which would dig the hole was still in the cradle on the truck bed and had to be lifted off the truck with the crane/boom to then be attached to the boom in order to dig the hole.

Foreman Otto's task after attaching the auger to the boom from the cradle in which it was transported on the digger-derrick vehicle was then to act as the signalman for Martin, who would operate the boom and lift the auger from the cradle on the truck and then place it on the ground. After attaching the auger to the boom, Foreman Otto got off the truck to the ground, moved away from the digger derrick truck and began directing Martin with hand signals on where to lift and place the auger on the ground.

Martin then lost sight of Foreman Otto, as Foreman Otto changed location. However, Martin continued to lift and rotate the derrick boom. The boom neared the 7,200 volt wire and the boom, while not contacting the wire, approached close enough to the wire that the electricity

arced and proceeded through the boom into the digger derrick and then through the outriggers to the ground.

Foreman Otto, while not near the truck, was electrocuted.

### MISTAKES OF FACT AND LAW

The SHO clearly ignored the fact that Otto and Martin were not to start their portion of the work in setting the new pole until the AEP crew had arrived and installed the protective rubber blanket on the distribution wire to guard the wire from accidental contact. AEP's portion of that work in guarding the wire from accidental contact is compliance with the first prong of OAC 4121:1-5-23(1)(3). (see Page 50-51 of the Hearing Transcript.) TEI was not to touch or perform any work on the distribution wire. (See deposition transcript of Lester Elgin at Pages 21 and 29 and of Richard Householder at Page 71.)

The SHO also ruled that TEI did not designate an employee to act as a signalman. The record clearly shows that Otto, the crew foreman, designated himself to act as a signalman and actually was performing work as a signalman when the injury occurred. (See Page 42 of the Hearing Transcript.) These are clear mistakes of fact and law.

* * *

As the record shows, the Employer, through the scope of its work with AEP in which AEP was to cover the wire with rubber hoses to prevent accidental contact and by Otto designating himself as the signalman, clearly complied with the two prongs of the requirements of OAC 4121:1-5-23(D)(3). The proximate cause of the injury is that Otto did not wait to start his portion of the work until AEP applied the protective rubber identification and hoses on the wire to guard the wire from accidental contact, did not use the provided grounding device on the digger derrick truck and did not use his protective rubber overshoes. As the Employer clearly complied with all applicable safety regulations, it is the Employer's contention that Otto's three acts of unilateral negligence as noted above were the proximate cause of his injury. The SHO made a clear mistake of law in ruling that unilateral negligence did not apply here.

{¶ 42} 14. On August 25, 2015, Terry and Jessica filed a written response to relator's motion for rehearing.

{¶ 43} 15. On September 3, 2015, relator filed a reply brief in support of motion for rehearing.

{¶ 44} 16. On September 9, 2015, Terry and Jessica moved to strike the reply brief.

{¶ 45} 17. On September 15, 2015, another SHO mailed an order denying relator's August 20, 2015 motion for rehearing. The SHO's order explains:

> It is hereby ordered that the Motion for Rehearing filed 08/20/2015 be denied. The Employer has not submitted any new and relevant evidence nor shown that the order of 06/03/2015 was based on an obvious mistake of fact or on a clear mistake of law.
>
> As the requirements of Ohio Admin. Code 4121-3-20 (E)(1)(a) or (b) have not been met, the request for a VSSR rehearing must be denied.

{¶ 46} 18. On January 13, 2016, relator, Thompson Electric, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 47} The main issue is whether the commission abused its discretion in determining that relator had violated Ohio Adm.Code 4123:1-5-23(D) by failing to satisfy Ohio Adm.Code 4123:1-5-23(D)(3), which provides that the employer shall "[a]ssure that the conductor is guarded from accidental contact and an employee is designated to act as signalman to direct the operator in the movement of the equipment."

{¶ 48} Finding that the commission abused its discretion in determining that relator had failed to satisfy Ohio Adm.Code 4123:1-5-23(D)(3), it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

### Pertinent Administrative Rules

{¶ 49} As earlier noted, decedent's fatal injury and death occurred on May 25, 2011.

{¶ 50} Effective April 10, 2011 and currently, Ohio Adm.Code 4123:1-5 is captioned "Workshop and Factory Safety." Thereunder, Ohio Adm.Code 4123:1-5-23 is captioned "Electrical conductors and equipment."

{¶ 51} Thereunder, effective April 10, 2011 and currently, Ohio Adm.Code 4123:1-5-23(D) is captioned "Minimum clearance." It provides the specific safety requirement that the commission found was violated and the proximate cause of the fatal injury at issue here.

{¶ 52} Ohio Adm.Code 4123:1-5-23(D) provides:

> Before an employee moves or operates power cranes, shovels, backhoes or any other type of material hoisting equipment within ten feet of an energized electrical conductor, the employer shall:
>
> (1) Assure that the conductor is deenergized and grounded, or
>
> (2) Assure that the conductor is moved, or
>
> (3) Assure that the conductor is guarded from accidental contact and an employee is designated to act as signalman to direct the operator in the movement of the equipment, or
>
> (4) Assure that an insulated boom or an insulated type guard about the boom or arm of the equipment and a dielectric insulator link between the load and the block are installed and an employee is designated to act as signalman to direct the operator in the movement of the equipment.

{¶ 53} It can be noted that the four requirements are stated in the disjunctive. Thus, the employer need only satisfy one of the four requests under Ohio Adm.Code 4123:1-5-23(D).

{¶ 54} Here, in the SHO's order of June 3, 2015, the commission finds that relator failed to meet all four of the requirements. However, in its August 20, 2015 motion for rehearing, relator asserts that it satisfied Ohio Adm.Code 4123:1-5-23(D)(3) and, thus, it cannot be found that relator failed to meet the minimum clearance requirements of Ohio Adm.Code 4123:1-5-23(D).

### Basic VSSR Law

{¶ 55} It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. *State ex rel. Watson v. Indus. Comm.,* 29 Ohio App.3d 354 (10th Dist.1986); *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989).

{¶ 56} It is also firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion. *State ex rel. Roberts v. Indus. Comm.*, 10 Ohio St.3d 1

(1984); *State ex rel. Allied Wheel Products, Inc. v. Indus. Comm.*, 166 Ohio St. 47 (1956); *State ex rel. Volker v. Indus. Comm.*, 75 Ohio St.3d 466 (1996).

{¶ 57} Of course, the commission's authority to interpret its own safety rules is not unlimited. Strict construction does require that the commission's interpretation be reasonable. *State ex rel. Martin Painting & Coating Co. v. Indus. Comm.*, 78 Ohio St.3d 333 (1997). The commission may not effectively rewrite its own safety rules when it interprets them. *State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77 (1996).

### Basic Mandamus Law

{¶ 58} "In any order of the Industrial Commission granting or denying benefits to a claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision." *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), syllabus. The commission need not cite evidence it has considered and rejected; nor must it explain why it finds certain evidence to be unpersuasive. *State ex rel. Scouler v. Indus. Comm.*, 119 Ohio St.3d 276, 2008-Ohio-3915, ¶ 15 citing *State ex rel. DeMint v. Indus. Comm.*, 49 Ohio St.3d 19, 20 (1990). *See also State ex rel. Lovell v. Indus. Comm.*, 74 Ohio St.3d 250, 252 (1996). However, a reviewing court will not "search the commission's file for 'some evidence' to support an order of the commission not otherwise specified as a basis for its decision." (Emphasis removed.) *Noll* at 204, citing *State ex rel. Cox v. Indus. Comm.*, 67 Ohio St.2d 235 (1981).

### Analysis

{¶ 59} It is undisputed that the energized distribution wire that arced electrical current to the boom of the digger truck was not covered with blankets or line hoses that would have prevented the electrocution of decedent.

{¶ 60} As indicated by the hearing testimony of relator's vice-president, Bill Anderson, Thompson Electric was not authorized by American Electric Power ("AEP") to place blankets or line hoses on the energized distribution line. According to Mr. Anderson, AEP reserved for itself the responsibility for covering the distribution line. According to Mr. Anderson, under such circumstances, on the date of the fatal injury, decedent and Jim Martin should not have proceeded to move the auger into place with the boom until AEP had covered the distribution line with blankets or line hoses. However, for reasons that are not clear, decedent and Mr. Martin did not wait for AEP to perform its responsibility for covering the energized distribution line.

{¶ 61} Mr. Anderson's hearing testimony, as indicated above, was clearly intended as Thompson Electric's asserted factual basis showing that, under Ohio Adm.Code 4123:1-5-23(D)(3), Thompson Electric had assured that the conductor was to be guarded from accidental contact. While the conductor was obviously not guarded by line hoses or blankets at the moment of the fatal injury, relator argues that it must be allowed reliance on AEP's responsibility to cover the distribution wire and relator's lack of authorization to cover the wire without AEP's assistance. There is no evidence that decedent or Mr. Martin were instructed by any supervisor at Thompson Electric to proceed without AEP covering the distribution line.

{¶ 62} Mr. Anderson's hearing testimony was relator's critical defense to the assertion that it had violated all four of the requirements under Ohio Adm.Code 4123:1-5-23(D). Yet that critical issue or defense is not addressed or mentioned in the SHO's order of June 3, 2015. Rather, in conclusory fashion, the SHO simply holds that "none of the four requirements * * * were complied with." In support, the SHO simply cites to the "Investigation unit packet on file, signed affidavits and testimony at hearing from Mr. Shortridge, the Injured Worker's expert, and Mr. Anderson."

{¶ 63} The general citation to evidence is so non-specific that this court and magistrate is invited by the SHO to search the record for the testimony or evidence supporting a finding the relator must be held accountable in the VSSR proceeding for the absence of line hoses on the distribution lines at the time of injury.

{¶ 64} Thus, the SHO's order of June 3, 2015 finds that relator failed to "assure that the conductor is guarded from accidental contact," as stated by Ohio Adm.Code 4123:1-5-23(D)(3), yet the order provides no explanation for the finding and the evidence supporting the explanation. This was a violation of *Noll*, requiring this court to issue a writ of mandamus. *See State ex rel. Gerstenslager Co. v. Wilson,* 10th Dist. No. 06AP-512, 2007-Ohio-2657.

{¶ 65} Clearly, it is not the duty of this magistrate or this court to determine for the commission whether relator can rely on AEP's alleged responsibility to cover the distribution wire and relator's alleged lack of authorization to cover the wire.

{¶ 66} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate the SHO's order of June 3, 2015, and, in a manner consistent with the magistrate's decision, enter a new order that, in accordance with *Noll*, finds whether or not relator complied with Ohio

**Adm.Code 4123:1-5-23(D)(3) by its alleged reliance on AEP to cover the distribution wire at issue here.**

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).